511 So.2d 1223 (1987)
Marilyn G. CANADA, Appellant,
v.
Charles H. MYERS, et al., Appellees.
No. 18789-CA.
Court of Appeal of Louisiana, Second Circuit.
August 19, 1987.
Rehearing Denied September 17, 1987.
Writ Denied November 20, 1987.
*1224 Robert A. Jahnke, Shreveport, for appellant.
Bodenheimer, Jones, Klotz & Simmons by F. John Reeks, Jr., Shreveport, for appellees, Charles W. Myers & Casualty Reciprocal Exchange.
Blanchard, Walker, O'Quin & Roberts by L. David Cromwell, Shreveport, for appellees, Travelers Ins. Co. & Rickey Gene Richey.
Nelson & Achee, Ltd. by James S. Denhollem, Shreveport, for Intervenor, Allstate Ins. Co.
Before MARVIN, SEXTON and NORRIS, JJ.
NORRIS, Judge.
This appeal arises from a rear-end collision in which the plaintiff, Marilyn Canada, was found free of fault and the tortfeasor's insurer, Casualty Reciprocal Exchange ("CRE") was condemned to pay her damages. The trial court also ordered a refund to CRE of unused policy limits it had placed in the registry of the court several months after suit was filed. Mrs. Canada now appeals, seeking an increase in her damage award and an order authorizing her to withdraw the entire policy limits on deposit in the registry. Her Med-Pay insurer, Allstate, who had intervened at trial, answers the appeal, asserting its subrogation clause for any increase she might receive. For the reasons expressed, we amend and recast the judgment to award legal interest but in other respects affirm.

FACTS
Before the accident, Mrs. Canada was working the late shift as a machine operator at Boots Pharmaceuticals. She was driving home after work, around 11:45 p.m. on July 20, 1984. She was waiting in stopped traffic on Bert Kouns Road when she was suddenly hit from behind. She was pushed into the car ahead of her and then skidded 98 feet, until her car slid off the road into a ditch. She had actually been the third car in a four-car collision. The driver of the first vehicle, CRE's insured, was found 100% at fault in causing the accident and this aspect of the case has not been appealed.
Mrs. Canada experienced immediate pain in the back of her head and neck. She was hysterical when she climbed out of her wrecked car; she immediately asked a passerby to give her a ride home. After she returned to the scene of the accident and gave her information to the police, she went to the emergency room at South Park Hospital. The doctor there gave her some medicine, advised her to see an orthopedist, and discharged her that night.
The following Tuesday she visited Dr. Ragan Green, her orthopedist. For the neck pain, Dr. Green fitted her with a neck brace. She also complained of pain in her left hand and wrist, along with itching, redness and swelling of the fingers. She related to him that even before the accident, she had experienced problems with the wrist but that these had been limited to occasional numbness. Dr. Green performed a number of physical tests to substantiate the complaint; these were negative except for a possible Tinel's sign of carpal tunnel syndrome, which he considered unrelated to the accident or a slight aggravation of a pre-existing problem. An X-ray of the wrist was negative. Dr. Green placed her in a wrist splint, prescribed *1225 an anti-inflammatory drug and a muscle relaxant, and scheduled her for physical therapy. He thought she should be able to return to work in about two weeks.
About two weeks later she went back to Dr. Green, complaining that the left hand was worse. She had been unable to attend therapy because she had no transportation. Dr. Green sent her to Dr. Kenneth Gaddis, the neurologist, for an EMG and nerve conduction test.
When Mrs. Canada went to Dr. Gaddis, she did not complain about her symptoms so he did not conduct a general examination. He did, however, perform the EMG and the nerve conduction test; both were normal. Mrs. Canada relayed these results to Dr. Green, along with the recommendation of another complicated test, a cervical myelogram. Dr. Gaddis did not recall recommending this myelogram, saying he had merely been called in to perform it, but Dr. Green seemed to think that Dr. Gaddis had advised it. Gaddis's Dep., 9; Green's Dep., 9.
Mrs. Canada underwent the myelogram at Schumpert on September 12. At this time she reported to Dr. Gaddis a prior condition somewhat worse than she had related to Dr. Green. Before the accident, she had suffered not only from numbness but also from tingling (which was now her chief complaint) that usually set in at night and once had woken her up. She also told him that during the impact, she had been gripping the steering wheel very hard and had hit her head against the headrest, details that she specifically did not recall at trial. R.p. 115. Dr. Gaddis followed up with a battery of neurological exams and could find no abnormalities except a slightly decreased sensitivity of the left hand fingertips. He told her to keep her wrist in the brace and to avoid heavy lifting or repetitive motions at work, but Mrs. Canada had not returned to work.
Mrs. Canada's testimony at trial offered additional proof that her condition had been rather severe before the accident. Although on direct examination she emphatically denied pain, numbness, swelling, tingling and itching prior to the accident, her statements by deposition in her related workers comp suit were to the contrary. R.p. 126-127. This deposition was used to impeach her. She also admitted on direct examination that on three or four occasions at work, her left hand had "frozen up" and she was unable to move it. These freezeups were not painful, but were inconvenient as she had to wait a minute or so for sensation to return. She stressed that these incidents had not been severe enough to interfere with her work in a substantial way and she had never missed work on account of them, although she had a serious problem with absenteeism for various other causes.
In November 1984 she was still complaining about her wrist; the neck sprain had by now been long resolved. Additional EMG and nerve conduction tests were run and were negative; even the Tinel's sign was no longer "true" in Dr. Green's estimation. Green's Dep., 15. Dr. Green still recommended therapy and a return to light-duty work. She never went back to work. In January 1985, on the strength of Dr. Green's letter saying there was no evidence of carpal tunnel syndrome, Boots wrote her demanding her return to work within three days; she did not return and was fired.
Mrs. Canada filed the instant suit in March 1985; trial was held in May 1986. The trial court awarded her $1,500 for the neck injury and this is not appealed. The court concluded that she had not proved by a preponderance of evidence that the accident caused the wrist problem or aggravated a pre-existent one. He therefore denied all claims and expenses arising from that injury. She received the emergency room medicals, lost wages for two weeks and the deductible on her collision insurance, bringing her total award to $2,099.20. Her Med-Pay carrier, Allstate, was awarded $341. Mrs. Canada has now appealed; Allstate has answered, requesting an increase in the event that Mrs. Canada receive an increase of medical expenses.

ASSIGNMENTS NOS. 1, 2 & 3
By her first three specifications of error, Mrs. Canada claims the trial court committed *1226 manifest error in not finding that the accident caused or aggravated her wrist problem and in denying her any award for the alleged injury. She concedes that she had a prior problem but claims that it was never acute or painful, as it has become after the accident. See Sansonni v. Jefferson Par. Sch. Bd., 344 So.2d 42 (La.App. 4th Cir.1977), writ denied 346 So.2d 209 (La.1977); Sepulvado v. Willis-Knighton Med. Center, 459 So.2d 152 (La.App. 2d Cir.1984), writ denied 462 So.2d 197 (La. 1984). She also points out that even though the physicians could not definitely link the injury to the accident, and could not even find the first objective sign of an injury, her consistent complaints were sufficient to establish the reality of her injury.
At the outset we must note that the trial court made a specific finding as to Mrs. Canada's lack of credibility. He cited the frequency and ease with which she had been impeached at trial and concluded that he could place little weight on her testimony. The trial court is in the optimal position to view the witness's demeanor on the stand and to listen to the nuances of her delivery when she testifies. Because its assessment draws on the first hand observation of witnesses, the court's finding of credibility is accorded a high degree of respect and will not be overturned absent a showing of manifest error. Canter v. Koehring Co., 283 So.2d 716 (La.1973).
As the trial court observed, the evidence is riddled with inconsistencies. As already noted, many of these stem from Mrs. Canada's testimony in the suit she filed seeking workers comp benefits. By the petition in that suit, she alleged that the functions her job required, especially the twisting and turning of small machine parts on a regular basis, had caused the condition (the medical evidence will substantiate this to a degree) and that it had been getting progressively worse until the accident. In depositions, she testified that even before the accident, she suffered not only from "freeze-ups" but from swelling, itching and redness, and that these symptoms had been growing more severe. On cross-examination she also admitted that her hand and entire arm had gone to sleep for a whole day sometime late in May, 1984. R.p. 117. Needless to say, this conflicted squarely with her direct testimony that the condition was only incipient and mild prior to the accident. We are constrained to hold that the trial court did not commit manifest error in the assessment of the plaintiff's credibility. Canter v. Koehring Co., supra.
The medical evidence also focused on how Mrs. Canada's job might have affected her hand. Dr. Green said that anyone who works on an assembly line is at risk of carpal tunnel syndrome. Dr. Gaddis added that repetitive motion was a leading cause of the syndrome. Neither doctor was able to express an opinion about what her problem really was. Dr. Green found only one symptom, Tinel's sign, and this is not an entirely objective observation. He later concluded that her sign was not "true." Dr. Gaddis expressed doubt whether a Tinel's sign was a reliable indication of the syndrome anyway. Gaddis's Dep., 24. Dr. Gaddis felt that her history was consistent with a hypothesis of carpal tunnel syndrome, but in the absence of any objective evidence he could not make a diagnosis. He said that an auto accident in which Mrs. Canada was gripping a steering wheel upon impact could have aggravated the condition, but he refused to say that it did more probably than not. Notably, Mrs. Canada did not mention to Dr. Gaddis that her pre-accident numbness had once lasted a whole day and that she had experienced freeze-ups at work. Dr. Green concluded that she showed symptoms both before and after the accident, so he could not relate the condition to an objective aggravation. If so, it was only slight.
Dr. Green made two other comments that contribute to our perplexity about the case. He said that when patients have carpal tunnel symptoms, they usually either resolve themselves or else convert to an abnormal nerve conduction velocity. Green's Dep., 33. Mrs. Canada, however, never showed an abnormal nerve conduction velocity, and she certainly did not stop complaining about her condition. Dr. McAlister, an orthopedist who examined *1227 her only once, corroborated that a condition caused by an accident such as Mrs. Canada's usually does not linger for as long as Mrs. Canada's has. McAlister's Dep., 16. Second, Dr. Green commented that most patients suffer pain only intermittently, whereas Mrs. Canada claimed her pain was constant. Green's Dep., 38. Dr. Green would not say that her complaints were inconsistent, but they were obviously different enough from the norm to dissuade him from making a concrete diagnosis.
Further crippling her credibility and adding to the confusion is the fact that Mrs. Canada filed an unemployment claim alleging she was able to work in January 1985. R.p. 139.
While Dr. Green was disinclined to doubt the sincerity of Mrs. Canada's complaints of pain, the medical tests were overwhelmingly negative; the medical opinions were inconclusive; and Mrs. Canada certainly gave inconsistent accounts of the history and progress of her condition. Given these difficulties, the trial court was entitled to find that the plaintiff did not meet her burden of proving that the accident caused her injury or aggravated a pre-existing condition. The trial court's conclusions are not manifestly erroneous. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). This aspect of the judgment is affirmed.

ASSIGNMENT NO. 4
Mrs. Canada's final specification of error deals with the money that CRE placed in the court registry. Roughly six months after suit was filed, CRE filed a motion to deposit into the court registry its policy limits of $10,000 plus $681.03 in interest and costs. The motion prayed for an order relieving CRE from any further liability for interest or costs after date. Judge Bolin signed the order authorizing the deposit, with the condition that the funds "be held subject to further orders of this court." R.p. 33. Ten months later, when the court rendered judgment of $2,099.20 for Mrs. Canada and $341 for Allstate, it ordered the balance refunded to CRE.
Mrs. Canada claims that she is entitled to the balance. She argues that placing money in the registry is CRE's admission that the entire sum was due. She cites LSA-C.C.P. art. 4658, which requires the plaintiff in a concursus proceeding to admit its liability before depositing the contested sum in the registry.[1] CRE claims that its motion and order were carefully phrased to relieve it of interest and costs and not to admit liability.
Contrary to Mrs. Canada's claims, the codal provisions for concursus do not apply to this case. A concursus action is one in which two or more persons having competing claims to money, property, or mortgages or privileges on property are impleaded and required to assert their respective claims contradictorily against all other parties to the proceeding. LSA-C. C.P. art. 4651. The purpose of concursus is to protect the stakeholder from multiple liability, conflicting claims and vexatious litigation in which the stakeholder may have no direct interest. Asian Int'l Inc. v. Merrill Lynch, 435 So.2d 1064 (La.App. 1st Cir.1983). Obviously this case satisfies neither the letter nor the spirit of the concursus action. The claimant is not a defendant, but the plaintiff; there are no competing claims of ownership except for an ordinary dispute between tort litigants over liability. The alleged competition must involve more than a single claimant. Lent Inc. v. Lemel Steel Fabricators, 340 So.2d 1035 (La.App. 1st Cir.1977), writ denied 343 So.2d 1075 (La.1977). CRE has not been exposed to conflicting claims or vexatious litigation in which it has no direct interest, so there is no justification for extending it the protection of concursus. We also note that a deposit into court registry is not necessarily a requisite of concursus. Austral Oil Co. v. Milliken & Farwell Inc., 307 So.2d 377 (La.App. 1st Cir.1975), writ denied 310 So.2d 642 (La.1975).
*1228 CRE's procedure strikes us as more akin to an attempted tender and deposit than to a deposit in a concursus action. When a creditor refuses to accept performance, the debtor may place the money in the court registry, thereby producing all the effects of a performance from the time the tender was made, if declared valid by the court. LSA-C.C. art. 1869; Woodard v. George Cole Chevrolet, 468 So.2d 608 (La.App. 2d Cir.1985), writ denied 470 So.2d 881 (La. 1985). The effect of a valid tender and deposit would be, as CRE sought, to end the accrual of interest and costs.
We have closely examined the record to determine whether there was a valid tender and deposit. The law is settled that a separate act of tender need not precede the deposit. Hall v. Tircuit, 160 La. 68, 106 So. 677 (1926); cf. Jones v. Smalley, 5 La. 28 (1832). However, in order for the deposit to qualify as a valid tender, it must be unconditional. Schramm v. Toye Bros. Yellow Cab Co., 169 So. 116 (Orl.Cir.1936), amended on rehearing 170 So. 44 (Orl.Cir.1936); Pichauffe v. Naquin, 241 So.2d 574 (La.App. 1st Cir.1970). The supreme court has stated the requirements of a valid tender:
In order to make a valid tender the money must be placed in the power of the adverse party. If paid into court, it must be with the intention on the part of the debtor that the creditor shall be at liberty to take it out of court. Succ. of O'Keefe, 12 La.Ann. 246 (1857), at 247. CRE's motion and order emphatically do not place the money in Mrs. Canada's power. The money was intended to be held until an appropriate order released it. This does not make for a valid tender and deposit. Consequently the effects of tender and deposit cannot be claimed, such as the suspension of interest and costs. LSA-C.C. art. 1869; Pichauffe v. Naquin, supra; United Novelty Co. v. Salemi, 68 So.2d 808 (La.App. 2d Cir.1953). The portion of CRE's motion seeking relief from interest and costs must be denied. On the other hand, the failure of the attempted tender and deposit also carries the effect of not admitting liability. Mrs. Canada is not entitled to the entire sum under this theory.
We have finally examined the record to see if CRE somehow admitted a liability of $10,000 by act or declaration outside the framework of a concursus or tender and deposit. Without the aid of one of these statutory presumptions we cannot conclude that CRE's act was an admission of liability. Nothing in its motion concedes liability; the thrust of it is to avoid interest and costs. By making the deposit "subject to" further orders of the court, CRE was attempting to reserve its right to contest liability. In light of the plain intent, Mrs. Canada is not entitled to the entire deposit.
In sum, the act of deposit had absolutely no effect on this case. It did not admit liability and it did not suspend interest and costs. We therefore question the usefulness of the procedure unless the insurer is prepared to relinquish all control of the money.
Mrs. Canada claims in brief that the trial court did not award her interest and costs; CRE's brief claims otherwise. The judgment, however, awards to Mrs. Canada:
the sum of Two Thousand, Ninety-nine and 20/100 ($2,099.20) Dollars with legal interest from date of judicial demand and all costs of these proceedings. R.p. 71.
Later, the judgment directs reimbursement to CRE of its deposit less $2,099.20 to Mrs. Canada and $341 to Allstate; this does not clearly account for Mrs. Canada's legal interest. In order to avoid confusion, the judgment will be amended and recast as follows:
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the insurance proceeds previously deposited into the Registry of the Court be disbursed by the Clerk of Court to Marilyn G. Canada in the sum of Two Thousand, Ninety-nine and 20/100 ($2,099.20) Dollars with legal interest from date of judicial demand, to Allstate Insurance Company in the sum of Three Hundred, Forty-One and No/100 ($341.00) Dollars with legal interest from date of judicial demand, and the remainder of said sums on deposit in the Registry of the Court, less *1229 court costs, being paid to defendant, Casualty Reciprocal Exchange.
In all other respects, the judgment is affirmed. Because there is no change in the award of medicals, Allstate's appeal is dismissed. Costs of appeal are assessed equally to appellant Marilyn Canada and to appellee Casualty Reciprocal Exchange.
AMENDED, RECAST AND AFFIRMED.

ON APPLICATION FOR REHEARING
Before FRED W. JONES, Jr., NORRIS, MARVIN, SEXTON and LINDSAY, JJ.
Rehearing denied.
NOTES
[1] LSA-C.C.P. art. 4658 provides in part:

With leave of court, the plaintiff may deposit into the registry of the court money which is claimed by the defendants, and which plaintiff admits is due one or more of the defendants.
* * * * * *